FILED

2007 May-16  PM 12:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| LINDA CASHMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 7:05-cv-01873-JEO |
| | ) | |
| THE UNIVERSITY OF ALABAMA | ) | |
| BOARD OF TRUSTEES, and | ) | |
| LYNDA GILBERT, BILL | ) | |
| McREYNOLDS, CHARLOTTE | ) | |
| HARRIS, and DR. ROBERT E. | ) | |
| WITT, in their official and | ) | |
| individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This matter is before the court on the defendants'[1] motion for summary judgment filed on August 30, 2006 (doc. 31), as well as the plaintiff's motion to strike portions of David Jones's affidavit testimony filed September 18, 2006 (doc. 41), and the defendant's motion to strike certain factual citations from the plaintiff's response brief filed on September 28, 2006 (doc. 49).[2] On April 2, 2007, the court heard oral argument on the motions. Upon consideration of the record, the submissions of the parties, the parties' arguments at the hearing, and the relevant law, the court finds that the defendants' motion for summary judgment is due to be granted; that the plaintiff's motion to strike is due to be denied; and that the defendant's motion to strike is due to be granted in part and denied in part.

---

[1] The plaintiff's second amended complaint consists of two counts: Title VII gender discrimination and retaliation and a due process claim. The Title VII claims are against the University only and the due process claim is against the individual defendants in both their individual and official capacities.

[2] References to "Doc. __" are to the documents as numbered by the clerk of court in the court's record of the case.

# I.    PROCEDURAL HISTORY

The plaintiff, Linda Cashman ("Cashman" or "the plaintiff"), filed a charge of discrimination with the EEOC on February 2, 2005.  (Doc. 43 at Ex. 44).  Thereafter, on September 2, 2005, she filed her complaint in this court asserting claims of discrimination and retaliation against the defendant, The University of Alabama Board of Directors ("the University" or "the defendant").  She then filed a motion to amend scrivener's errors in her complaint on September 19, 2005 (doc. 4), and later filed her second amended complaint on April 6, 2006, to add a due process claim against Witt, Portera, Gilbert, and Harris.  (Doc. 16). The defendants filed a motion to dismiss Count II of the plaintiff's second amended complaint (doc. 19), which the court had not yet ruled on at the time the defendants moved for summary judgment.  Because the defendants have moved for summary judgment on the entirety of the plaintiff's complaint (doc. 31),[3] the motion to dismiss is now moot.[4]

---

[3]At oral argument, the plaintiff raised for the first time the argument that her complaint also includes a discriminatory failure to hire claim in addition to the gender discrimination and retaliation claims, which the defendants have moved for summary judgment on.  The court is not convinced, even upon a thorough reading of the second amended complaint, that the plaintiff has asserted a separate claim for discriminatory failure to hire based upon the ADHO position.  However, even had the plaintiff properly raised the claim in her complaint, she failed to raise it in the EEOC charge, which would make the claim administratively barred.  Although the plaintiff argued at the hearing on this matter that the defendant has waived the administrative bar argument by not raising it, the court disagrees.  First, the court finds that the plaintiff's complaint is so vague that the defendants could not have known she was attempting to raise a separate claim of discriminatory failure to hire. Additionally, until the time of oral argument, the plaintiff had made no mention of the purported claim.  The plaintiff certainly was aware that the defendants were moving for summary judgment on the entirety of her complaint before the hearing.  Secondly, the plaintiff's complaint contains two counts - - "claims of discrimination and retaliation" and "violations of plaintiff's rights to procedural due process under the Fourteenth Amendment."  As the defendant has moved for summary judgment on "both counts" of the plaintiff's complaint, the defendant cannot be prejudiced for failing to parse a claim out of the plaintiff's complaint that the plaintiff did not parse out herself.  Furthermore, because the discriminatory failure to hire claim involves the same considerations as the gender claims - - discriminatory intent - - the court would have found that claim due to be dismissed as well, as there simply is not evidence in the record of intentional discrimination based upon the plaintiff's gender.

[4]Additionally, a broad reading of the plaintiff's complaint could include a claim of discrimination in the hiring of Dan Wolfe's position.  To the extent the plaintiff attempted to assert that claim, she represented at oral argument that any such claim was abandoned.

II.    FACTS[5]

The plaintiff has a bachelor's degree and a master's degree from the University of Alabama in Interior Design.  (Cashman Dep. at pp. 9-11).[6]  The plaintiff was employed with the University as the Assistant Director for Facility Planning and Design, Housing Facilities, and Housing Operations.  In her words, the plaintiff was the "University's designer" for residence halls.  (Cashman Dep. at pp. 235-36).  According to the plaintiff, her job duties included the management and monitoring of the condition of the residence halls; performing walk throughs and inspections of the residence halls; setting up model rooms in the residence halls; preparing quarterly reports; preparing budgets; keeping an inventory of furnishings; placing work and repair orders; writing bids and requests for furniture, carpeting, and fabric; specifying mattresses for replacement; maintaining and upgrading the residence halls; maintaining a five-year outlook plan; meeting with student focus groups; preparing insurance estimates; insuring items in the residence halls met the proper fire and safety codes; insuring the residence halls met the standards of the ADA; preparing drawings and space plans; meeting with trades people; meeting with staff within and without the department; meeting with dealers, vendors, and outside architects and designers; scheduling upholstery; performing design work for other departments in the University; attending housing conferences; observing housing design at other institutions; updating books on residence hall maintenance and inventory; performing inventory control; interacting with parents of University students; supervising graduate students and interns;

_____

[5]The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff.  They are the "'facts' for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)."  *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[6]Cashman's deposition is located at doc. 32, Ex. 1 and doc. 43, Ex. 1 in this court's record of the case.

assisting in obtaining upholstery for the Health Center; picking finishes for the new Facilities building; and renovations of the fraternity and sorority buildings. (Cashman Dep. at pp. 13-17; 34-40; 41-56; 59-77; and 136-37; Doc. 43 at Ex. 2). The plaintiff's interior design duties were generally confined to the residence halls, but she sometimes received requests for interior design services from other areas of the University for which she had to get permission to work. (Cashman Dep. at p. 56).

The plaintiff remained employed with the defendant[7] in this capacity from her hire in the 1980's until her termination on November 10, 2004. (Cashman Dep. at pp. 22-26). When the plaintiff first occupied the Assistant Director for Facility Planning and Design position, it was part of the Residential/Student Affairs ("Student Affairs") department. The position was later moved to the Facilities department. (Cashman Dep. at pp. 16-22; 80). The Facilities Department was directed by the Vice President of Finance and Treasurer, Dr. Lynda Gilbert. (Gilbert Aff. at ¶ 3).[8]

### A.    Proposed Upgrade and Expansion of the Plaintiff's Job Description

According to the plaintiff, Thad Turnipseed, Facilities Director, asked her to create an upgraded job description for herself as a Senior Designer in Facilities in order to handle design issues on a University wide scope including capital projects and renovations. (Cashman Dep. at pp. 93-96; 108-10). She and Dan Wolfe collaborated on creating a proposed job description for a University-wide interior design position that would be supported by two design assistants.

---

[7]For approximately two years in the late 1990's, the plaintiff remained employed with the defendant in a Consultant capacity but continued to perform the same job duties and functions which she held as the Assistant Director for Facility Planning and Design. (Cashman Dep. at pp. 22-23).

[8]Gilbert's affidavit is located at document 32, exhibit 4 in this court's record of the case.

4

(Cashman Dep. at pp. 93-96; Wolfe Aff. at ¶ 8;[9] Doc. 43 at Ex. 3).  On May 21, 2004, Turnipseed and Coress Brandon, the Associate Director for Facilities and the plaintiff's supervisor, submitted an expanded job description and upgrade for the plaintiff to include "work with overall departmental projects in addition to housing."  (Brandon Dep. at p. 26).[10]  In July 2004, Dan Wolfe, the Associate Director of Facilities Planning, drafted a letter proposing the idea that the University expand the Interior Design department to provide in-house interior design services on a campus wide scope in order to save money being spent on outside designers and to help ensure standardization of the furniture on campus.  (Wolfe Dep. at pp. 8;[11] 58; 60-62; 70; Doc. 43 at Ex. 6).  Wolfe submitted the proposed job description to Human Resources for evaluation and budget purposes.  (Cashman Dep. at pp. 131-34; Wolfe 65-70; Doc. 43 at Ex. 7). Wolfe met with Victoria Perry, a Senior Human Resources Generalist, regarding approval of the campus-wide Interior Design position and it was Wolfe's understanding that they were moving forward with the upgrade.  (Wolfe Dep. at pp. 73-76; Perry Dep. at pp. 13-14).[12]  Wolfe asked Perry to help him draft the job description and Perry worked with Wolfe on reviewing the position for the Human Resources' evaluation of pay grade and exemption status.  (Perry Dep. at pp. 40-43).  During Wolfe's discussions with Perry, he never mentioned that elimination of the plaintiff's position was being considered.  (Perry Dep. at pp. 52-53).  To the contrary, Wolfe indicated that the position being drafted was about Cashman.  (*Id.*).

---

[9]Wolfe's affidavit is located at document 32, exhibit 9 in this court's record of the case.

[10]Brandon's deposition is located at document 43, exhibit 5 in this court's record of the case.

[11]Wolfe's deposition is located at document 43, exhibit 4 in this court's record of the case.

[12]Perry's deposition is located at document 43, exhibit 8 in this court's record of the case.

In a September 2004 meeting, Dr. Lynda Gilbert, the Vice President of Finance, commented to the plaintiff that the Facilities department is a "chauvinistic good ole boy system," and that she was going to do something about the situation. (Cashman Dep. at pp. 148; 150-51). Brandon also discussed the upgrade and expansion of the plaintiff's position with Dr. Gilbert who seemed "very positive" about the change. (Brandon Dep. at pp. 64-66). Dr. Gilbert testified that she never had any conversations with any superiors about an upgrade to the plaintiff's position. (Gilbert Dep. at pp. 57-58; Gilbert Aff. at ¶ 9).

In September 2004, Bill McReynolds, the Interim Director of Facilities,[13] informed the plaintiff that he was aware of the upgrade of her position and was proceeding with the upgrade. (Cashman Dep. at pp. 125-26). McReynolds and Brandon also discussed the upgrade of the

---

[13]McReynolds was a Hoar Construction employee who was appointed acting Interim Associate Director of Facilities. (McReynolds Dep. at pp. 10-20). McReynolds' appointment was pursuant to a contract entered into between the University and Hoar Construction by which Hoar agreed to perform "daily construction administration services for the various departments within the University Facilities area." (Doc. 33 at Ex. 4A). Specifically, the contract provided that the services performed would include:

    1.    . . . without limitation, providing management services for the day-to-day operations of those various departments, including, without limitation, task assignments, attending meetings as the University's representative regarding various projects and other matters that fall within the Construction Administration's purview, attending Board of Trustees meeting and Board Committee meetings, making periodic reports to the Vice President for Financial Affairs . . . monitoring the work of University employees in those departments, and such other similar management services and activities as may be assigned or requested of Hoar by the University.  Hoar has designated one of its employees, Mr. Bill McReynolds, as the person who will perform these services.

    . . .

    5.    It is contemplated that in the course of providing construction administrative services, Mr. McReynolds may manage, guide, and lead University employees who work in the University Facilities area.   In the event personnel problems or disciplinary issues arise involving University employees, then Mr. McReynolds promptly shall refer those matters, as appropriate, either to the University Vice President for Financial Affairs and Treasurer or to the University's Human Resources Department for resolution.  **It is expressly understood that Mr. McReynolds has no authority to make personnel decisions that involve changes in pay, job positions, promotions, transfers or disciplinary sanctions, including warnings, suspensions, or terminations, that involve University employees.**

(Doc. 33, Ex. 4A at pp. 1-2) (emphasis added).

plaintiff's position and a corresponding move of the plaintiff's office.  (Brandon Dep. at pp. 39-40; 42-43).  Turnipseed, Wolfe, and the plaintiff discussed including interior design for the entire campus community in order to avoid the increased costs of outsourcing and to "not outsource at all."  (Turnipseed Dep. at pp. 168-70; 175; 182-83).[14]  Turnipseed requested that Wolfe undertake getting the plaintiff's position upgraded to bring all things "in-house."  (Turnipseed Dep. at p. 175).  On October 21, 2004, Bill McReynolds met with the plaintiff and told her he was recommending to Dr. Gilbert the title of Director of Design for the plaintiff's new position, and that the position would not be funded until January or February of 2005, but that he needed the plaintiff to go ahead and start performing the expanded job duties of that position at that time due to the number of ongoing projects.  (Cashman Dep. at pp. 127-28).

The plaintiff informed McReynolds that she had no problem with performing the expanded duties of the Director of Design position and asked that he communicate the matter to her supervisor, Coress Brandon so as to avoid conflicts.  (Cashman Dep. at pp. 128-29).  The next day, the plaintiff informed Brandon of McReynolds' request for her to begin performing the expanded duties of the Director of Design position.  (Cashman Dep. at pp. 129-30; Doc. 43 at Ex. 12).  Brandon reminded the plaintiff that her priority was to get the residential halls ready for the students in the fall.  (Brandon Dep. at pp. 50; 53; 60; Doc. 43 at Ex. 12).  Neither the University-wide interior designer position nor the two design assistants were ever approved by the University.  (Gilbert Aff. at ¶ 9; Wolfe Aff. at ¶ 8).

Brandon supervised the plaintiff for over twelve years.  (Brandon Dep. at p. 28).  Brandon testified that Cashman was an excellent and organized employee who performed her work in a

---

[14]Turnipseed's deposition is located at document 43, exhibit 10 in this court's record of the case.

timely fashion.  (Brandon Dep. at pp. 28-29).  On the plaintiff's May 2004 evaluation Brandon

noted:  "Have submitted job description for re-evaluation upgrade to work with overall

department projects in addition to housing."  (Brandon Dep. at pp. 35-36; Doc. 43 at Ex. 13,

Bates No. 0089).

### B.    Outsourcing and the Plaintiff's Job Elimination

Despite the talk of upgrading the plaintiff's position, Dr. Gilbert testified that she began

thinking about outsourcing interior design because of "non-uniform[ity]" on campus.  (Gilbert

Dep. at p. 59).  Dr. Gilbert wanted to create a "visual image" for the school and was "terribly

unimpressed with the quality of the furniture and designs in all the halls."  (Gilbert Dep. at pp.

59-60).  Dr. Gilbert was also concerned about an inconsistent design standard for all the

university buildings that resulted from using different architects and designers on different

buildings.[15]  (Gilbert Aff. at ¶ 6).  Additionally, outsourcing interior design services could save

the University money.  (Gilbert Aff. at ¶¶ 5-7).

McReynolds independently determined that outsourcing was the proper course and he

sought approval of that decision from Gilbert.  (Gilbert Aff. at ¶¶ 4-10).  In a memo written on

November 2, 2004, to Gilbert, McReynolds wrote:

>        While reviewing Facilities Personnel, and evaluating past performance and
> responsibilities, I have come to the conclusion that we need to consider a change
> in direction for Interior Design.  Currently we have one interior designer, Linda
> Cashman, who reports to Coress Brandon in Housekeeping.  Just recently, Linda
> has failed to perform as required on two major projects, The Loper Building and
> The Residence Halls.  She either did not or has not completed design, selection or
> ordering of furniture for these important projects.  She is impossible to keep track
> of, and cannot provide me with adequate details of her daily activities.

---

[15]The plaintiff was only responsible for the interior design of the residence halls.

8

It is my opinion that we should eliminate the position of Interior Designer immediately, and outsource all ID needs until we see the need for on-staff design. Our current staff, including Dan Wolfe and Hugh Kilpatrick can recruit and contract with outside sources who will be much more efficient than what we have seen lately.  Last year we outsourced over $300,000 in Interior Design on major Capital Projects.  So we are already doing it.  Why not eliminate some inefficiency.

I hope you will take this in consideration, and if you concur, I will get with Charlotte Harris to start the process.

(Doc. 50 at Ex. 3).  Gilbert concurred with McReynolds and decided to "eliminate" the plaintiff's job in order to outsource all design functions.  (Gilbert Aff. at ¶¶ 4-10; Gilbert Dep. at p. 62; Doc. 50 at Ex. 3).  Because McReynolds was not a University employee, he did not have the authority to make the decision to outsource or to eliminate the plaintiff's position without Gilbert's approval.  (Gilbert Aff. at ¶ 10).  As a manager, Dr. Gilbert had the authority to outsource, which she ultimately decided to do.  (Gilbert Dep. at p. 65).

On November 10, 2004, the plaintiff met with McReynolds[16] and Charlotte Harris, the Associate Vice President for Human Resources, at which time she was given a termination letter effective as of the close of business that day.[17]  (Cashman Dep. at pp. 137-40; Harris Dep. at p. 8;[18] Doc. 43 at Ex. 17).  McReynolds informed the plaintiff that she was not fired, but her job was eliminated because the University was going to outsource all design campus-wide.[19] (Cashman Dep. at pp. 140-41; 144-45).

---

[16]McReynolds testified that he made the decision to "eliminate" the plaintiff's position without consulting with anyone, and that he made this decision without knowing what the job duties of the plaintiff's position were.  (McReynolds Dep. at pp. 53-54; 56-59).

[17]Brandon, the plaintiff's immediate supervisor, was not informed of the termination until the morning of November 10, 2004.  (Brandon Dep. at pp. 60-61).

[18]Harris's deposition is located at document 43, exhibit 16 in this court's record of the case.

[19] The University had always outsourced some design services.  (Cashman Dep. at pp. 177-78).

9

Around March 2005, the University initiated a process to select an outside firm to perform University-wide interior design services. (Johnson Aff. at ¶ 6; Doc. 33 at Ex. 6A).[20]  As part of the process, the University posted a Request for Proposals ("RFP") on the University website, notified interior design firms of the RFP by fax, and began an evaluation and selection process. (Johnson Aff. at ¶ 5).  The outsourcing process took longer than anticipated due to revisions with the RFP and the priority of other ongoing projects.[21]  (Gilbert Dep. at pp. 68-69; Johnson Aff. at ¶ 6).  Ultimately, all design functions were outsourced to the architecture and design firm Kahn South.  (Gilbert Dep. at pp. 68-69; Gilbert Aff. at ¶ 12; Johnson Aff. at ¶ 5).  While the RFP was posted in March 2005, and Kahn South submitted its proposal in early April 2005, the University did not actually begin contractually outsourcing any of these design functions until September 2005.  (Doc. 43 at Ex. 42).

Kahn South has provided interior design services for in-house projects, such as residence halls; renovations to buildings; has worked with outside architects and engineers to provide interior design services that otherwise would have been done for a fee by the architect or engineer; and is in the process of developing standards to create a "UA" look and feel.  (Johnson Aff. at ¶¶ 8-10).

According to Sharon Hale, a Human Resources Partner in the Office of Human Resources at the University,[22] Kahn South has taken over 70% of the duties in the plaintiff's former job

---

[20]Johnson's affidavit is located at document 32, exhibit 6 in this court's record of the case.

[21]At oral argument, counsel for the defendant also noted that the University "shuts down" for approximately two weeks at the end of the year, which further prolonged the outsourcing.

[22]A major part of Hale's job duties is the evaluation of position descriptions.  (Hale Aff. at ¶ 2).

description.  (Hale Aff. at ¶ 5).[23]  The other ancillary tasks that the plaintiff performed in her job have been picked up by other employees.  (Gilbert Aff. at ¶ 10).  Both Johnson and Hale testified that the ADHO position does not include any interior design.  (Hale Aff. at ¶ 5; Johnson Aff. at ¶ 7).

Following her termination, the plaintiff requested a meeting with Dr. Gilbert.  (Cashman Dep. at p. 147).  After a thirty-five to forty minute discussion regarding the termination, Gilbert conveyed that it was "a done deal."  (Cashman Dep. at pp. 154-55).  Dr. Gilbert also informed the plaintiff that the reason she had been given less than two hours notice of the effective date of her termination was because they were afraid the plaintiff would get upset when she saw the outsourcing Request for Proposal which was to be immediately placed on the Facilities website.[24] (Cashman Dep. at pp. 153-54; 195-96).

The plaintiff filed a complaint of discrimination with Gwendolyn Hood, the University EEO compliance officer, but later canceled her appointment with Hood.[25]  (Cashman Dep. at pp. 160-62; Doc. 43 at Ex. 19).  According to the plaintiff

> [McReynolds] got very angry because . . . Coress had told him that . . . it wasn't right to present me in a job that I didn't have a title of or formal job responsibilities of and . . . he just basically pitched a fit about it . . . he just had a fit that this woman was trying to tell - - and particularly this black woman was trying to tell him that he couldn't do something he wanted to do with me and he decided that it would probably be too hard to get rid of her so he just pitches a

---

[23]Hale's affidavit is located at document 32, exhibit 5 in this court's record of the case.

[24]According to University counsel at oral argument, Dr. Gilbert was in error in her assumption of how long it would take to get the RFP posted.

[25]Although the plaintiff complains that, "[a]t no time was the plaintiff afforded an appeal opportunity, mediation, hearing or any other form of dispute resolution as outlined by the University's employment policies," (doc. 43 at Ex. 46), the provision she quotes clearly states that "[t]hese procedures are not designed for appeals questioning employment decisions, work assignments, . . . or other non-arbitrary decisions . . . including an elimination of an employee's position."  (Doc. 43 at Ex. 46).

little hissy and gets rid of me."

(Cashman Dep. at pp. 164-67).

### C. Temporary Position Created in Student Affairs

After the plaintiff's termination, her job duties, such as furniture selection and purchasing, were not eliminated and still had to be performed. (Wolfe Dep. at pp. 50-51; Brandon Dep. at pp. 77-80). Prior to her termination, the plaintiff worked on the design, furniture selection and ordering for the new Riverside Residence Halls and The Loper Building. (Wolfe Dep. at p. 54). Following the plaintiff's termination, Wolfe was asked to "fill in" and deal with outside vendors, and with the selection and purchase of furniture for the new Riverside Residence Halls and The Loper Building. (Wolfe Dep. at pp. 49-52). Another employee, Rob Cooper, did some carpet orders and met with sales reps, while another female employee, Garnett Hatchett, took over some of the duties that were included in the upgraded job description. (Cashman Dep. at pp. 182-83; 225; 289-90).

The plaintiff's position was in the Facilities Department, which was under Financial Affairs and Gilbert's supervision. Molly Lawrence, the Assistant Vice President for Student Affairs decided that the ancillary duties that the plaintiff had performed for the residence halls should report through Student Affairs rather than Financial Affairs. Once the plaintiff's position was eliminated and the decision was made to outsource the interior design functions, Lawrence decided to combine the ancillary duties with other duties in order to reinstate a position that formerly existed in her department (Student Affairs). (Lawrence Aff. at ¶¶ 2-4).[26]

After receiving permission to reactivate the position, Lawrence hired Andy Beville into

---

[26]Lawrence's affidavit is located at document 32, exhibit 8 in this court's record of the case.

the temporary position of Coordinator for Residence Communities.  (Lawrence Aff. at ¶¶ 5-7; Hale Aff. at ¶ 7).  The justification for filling the position was to "cover the duties of [Cashman's former position] associated with residence hall furniture inventory."  (Doc. 43 at Ex. 25, p. 2). Beville's first job assignment in this position was to aid in furniture selection, and to insure all furnishings, trash cans and pictures were ordered and in place for the new Riverside residence hall.[27]  (Beville Dep. at pp. 145-47).[28]

During her employment, Cashman served on the selection committee for residential furnishings and Beville served in this capacity shortly after his hire in 2005.  (Lawrence Dep. at pp. 57; 64-65; Beville Dep. at pp. 168; 170-71).  In his May 2005 evaluation, Beville was commended for his design work such as identifying, selecting and ordering furniture and initiating the painting of original artwork in the residence halls common areas.  (Doc. 43 at Ex. 28, p. 7).  Beville continues to perform some of the plaintiff's prior job duties.  (Beville Dep. at pp. 146-47).

At the time he was hired, Beville had seven months experience in the Facilities/Residential departments.  (Beville Dep. at p. 232).  Beville has a B.S. degree in Sociology (1996) and a Masters in Communication Studies (2003).  (Beville Dep. at pp. 10; 14). Beville was first employed with the University in 1997 as an event coordinator for the Recreation Center and his duties were to hire, train and schedule the student staff.  (Beville Dep. at pp. 16-17; 32).  In June 2000, he became Manager of the Recreation Center facilities operations where he supervised the custodial staff and the building trades technician.  (Beville Dep. at pp.

---

[27]Beville was also instructed to spend time familiarizing himself with the residence halls due to his unfamiliarity with same.  (Beville Dep. at pp. 153-55).

[28]Beville's deposition is located at document 43, exhibit 23 in this court's record of the case.

60; 64-65; 75).

Beville requested to be paid back pay for performing the Associate Director of Housing Operations job description and duties before he was actually placed into that position.  (Doc. 43 at Ex. 29, pp. 3-6; Beville Dep. at pp. 215-16; Hale Dep. at pp. 144-45;[29] Jones Dep. at p. 27).[30] The University agreed to pay Beville back pay from May 2005, the date on which the job description of the Associate Director of Housing Operations position was finalized.  (Harris Dep. at pp. 121-23; Lawrence Dep. at pp. 79-80; Hale Dep. at pp. 146-48; Jones Dep. at pp. 165; 166; Doc. 43 at Ex. 30 and Ex. 29, pp. 1-2).  Molly Lawrence, the Assistant Vice President for Student Affairs, testified that Beville had been doing some of the responsibilities of Associate Director of Housing Operations since May 2005.  (Lawrence Dep. at pp. 46; 75-78).[31]  Lawrence approved placing Beville in the position.  (Lawrence Dep. at p. 79).  She also supported Beville's request for back pay through May 2005.  (*Id*.).

### D.    Outsourcing of the Plaintiff's Position

At the request of Harris and Sharon Hale, a meeting was held in April 2005 to discuss the RFP (Request for Proposal) for the design services but the actual contract for outside design services was not executed until September 28, 2005.  (Johnson Dep. at pp. 25-26; Hale Dep. at pp. 148-50; Doc. 43 at Ex. 42).  During this meeting, the plaintiff's former job duties and qualifications were discussed and her position description was reviewed.  (Johnson Dep. at pp. 33-35; 38-39; 43-44; Hale Dep. at pp. 165; 167-68).  Hale testified that the purpose of the

---

[29]Hale's deposition is located at document 43, exhibit 18 in this court's record of the case.

[30]Jones's deposition is located at document 32, exhibit 3 and document 43, exhibit 22 in this court's record of the case.

[31]Lawrence's deposition is located at document 43, exhibit 27 in this court's record of the case.

meeting was "to get a comparison . . . [of] whether or not the request for proposal included parts of Mrs. Cashman's position description."  (Hale Dep. at pp. 149-50; 163; 164).  At some point during the RFP meeting, Susanna Johnson, the Senior Buyer, remarked it would be necessary for the employees of Residential Life to "be very cautious due to LCS [the plaintiff's] contacts still with the University."  (Hale Dep. at pp. 180-82; Doc. 43 at Ex. 43).

### E.      Associate Director of Housing Operations Position

Because the Housing Department had been given facilities inventory and purchasing duties which it had not previously held due to a restructuring, David Jones, the Director of Housing and Residential Communities, was informed these duties needed to be addressed because the position that used to cover them was no longer there.  (Jones Dep. at p. 113).  Jones became the Director in February 2005.  His goals for the department included improving housing to national standards and creating a new level of excellence.  (Jones Aff. at ¶¶ 2-3).[32]  Per Jones's testimony, the functions of the plaintiff's position were not eliminated, but the person in the position was eliminated.  (Jones Dep. at pp. 116-17).

Beville, Molly Lawrence, and Sharon Hale provided input to Jones in helping to draft the job description and the PIQ ("Position Inquiry Questionnaire") for the Associate Director of Housing Operations ("ADHO") position.  (Beville Dep. at pp. 209-11; 239; Jones Dep. at pp. 147-49; Jones Aff. at ¶ 5).  A copy of the plaintiff's prior job description was also requested in preparation of the job description for the ADHO position.  (Lawrence Dep. at pp. 175-76).  Jones appointed a hiring committee to help narrow the pool and make a hiring recommendation.  (Jones Aff. at ¶ 6).

---

[32]Jones's affidavit is located at document 32, exhibit 7 in this court's record of the case.

On May 13, 2005, the plaintiff saw the ADHO position posted on the UA website and immediately applied on-line.  (Cashman Dep. at pp. 212-13; 255).  When Jones saw the plaintiff's application, he e-mailed Lawrence to let her know that the plaintiff was the first person to apply for the position.  (Lawrence Dep. at pp. 123-24; Doc. 43 at Ex. 31, p. 5).

The plaintiff also sent an e-mail to Jones informing him of her interest in the position and her prior work with the University.  (Doc. 43 at Ex. 31, pp. 1-2).  Jones later forwarded a letter of interest from Cashman for the position to Lawrence.  (Lawrence Dep. at pp. 118-19; Doc. 43 at Ex. 31, p. 3).  Jones forwarded the plaintiff's letter of interest because he was aware of the plaintiff's pending litigation with the University.  (Jones Dep. at pp. 173-75; 180-81).  Lawrence then forwarded this e-mail to share the plaintiff's comments, noting that the new position was "exactly [her] old job description," to Harris, Sharon Hale, and Mike Spearing, legal counsel for the University.[33]  (Hale Dep. at pp. 8-9; 88-90; Doc. 43 at Ex. 31, p. 1).  The selection committee met on June 16, 2005, to review the applications.  Upon receipt of Beville's application for the ADHO position, Hale noted it was, "Okay not great."  (Hale Dep. at pp. 73-74; Doc. 43 at Ex. 32).  During the interview process, Brandon had concern over Beville's application due to an unexplained gap in his employment history; over his lack of technical knowledge and experience with furnishings, fixtures, materials and equipment; and his lack of experience with safety issues and codes.  (Brandon Dep. at pp. 102-04).  Upon receipt of the plaintiff's application for the ADHO position, Hale noted it was, "Okay" and that the plaintiff met all the minimum qualifications.  (Hale Dep. at pp. 76- 77; Doc. 43 at Ex. 33).

---

[33]At this time Hale was aware the plaintiff had filed an EEOC charge against the University and that is the reason the plaintiff's letter of interest had been forwarded to Harris and Spearing.  (Hale Dep. at pp. 91-92).

At the request of Jones, Mark Foster, the Assistant Director for the University's Office of Student Judicial Affairs, served as the Chair of the selection committee[34] for the ADHO position. (Foster Dep. at pp. 7; 43-44; 81-82). At the start of this meeting, Jones spoke to the committee and informed them that some "litigation" was involved and for the committee to follow policy and procedure. (*Id.*). Foster then instructed the committee to review the applications and to return with their recommendations. (*Id.*).

The plaintiff's name was not among the initial June 24, 2005,[35] list of persons chosen by Jones and the committee to interview for the position. (Lawrence Dep. at pp. 116-18; 133; 190-92; Hale Dep. at pp. 80-81; Doc. 43 at Ex. 34). Additionally, two of the initially selected candidates, Tim Burton and Christine Walker, did not meet the minimum job qualifications.[36] (Lawrence Dep. at pp. 135-36; Foster Dep. at pp. 102; 110). When Hale realized that the plaintiff was not selected for an interview and that two of the people that were selected were not qualified for the position, she spoke with the University's legal counsel and then asked Lawrence to reconsider the applicants. (Hale Dep. at pp. 92-94; 102-03). The selection committee met again to review the applicants. (Foster Dep. at pp. 125-26). The committee then recommended three individuals to Jones for interviews, including the plaintiff. (Foster Dep. at pp. 126-27; Doc.

---

[34]The other committee members were Carl Bacon, April Sanders, Nels Strickland, and Ashley Evans (Student).

[35]The plaintiff notes that Lawrence did not provide the committee with any screening procedure information until 6:58 p.m. on June 24, 2005, after the initial interview candidates had been selected. (Doc. 43 at Ex. 51). In her e-mail, Lawrence also advised the selection committee of the potential for "challenges" to candidate selection. (Ex. 51). On that same day, the plaintiff e-mailed Harris, Dr. Robert Witt (the President of the University), and Dr. Malcolm Portera (the Chancellor of the University system) that she had not been selected for an interview to which Portera remarked to Witt that "We need to make certain that this is handled appropriately. Are we combining the functions of her job with those of an existing job?" (Doc. 43 at Ex. 49).

[36]Human Resources is responsible for culling out applicants that do not meet a position's qualifications. However, if a department has a strong interest in a candidate that has been automatically culled out, Human Resources can change the status of that candidate. With regard to the Associate Director position, Hale believes that the status of Tim Burton and Christine Walker were changed. (Hale Dep. at pp. 65-70).

17

43 at Ex. 36).  On July 15, 2005, Human Resources approved the following three candidates for

an interview: Linda Cashman, Tim Burton, and Andy Beville.  (Hale Dep. at pp. 113-14).  Via

e-mail dated July 20, 2005, Lawrence informed Jones, "Fyi. Should be notifying candidate [sic]

for interview next week.  I believe that Linda will be one of the ones recommended for interview

by the committee."  (Doc. 43 at Ex. 37).

    In August 2005, the plaintiff was called for an interview.  (Cashman Dep. at pp.

255-56).  Nels Strickland, the Associate Director of Facilities and Operations, testified that

during Beville's interview he gave "[t]he same kind [of answers] everybody else did."

(Strickland Dep. at p. 79).  During this stage, Strickland had placed an asterisk by the plaintiff's

name on the selection list.  Although Strickland had no recollection as to what the asterisk

represented, Foster recalled that Strickland told him that he initially did not select her for an

interview but then decided that he was going to add her to his list for an interview because of her

involvement in  "litigation."  (Strickland Dep. at p. 38;[37] Foster Dep. at pp. 102-03; 110).  When

Foster asked Strickland about the litigation, "the only thing [Strickland] mentioned was that [the

plaintiff] was no longer employed by the University; that the Interior Design component had been

outsourced."  (Foster Dep. at p. 120).  Strickland testified that Beville gave a "better interview"

than the plaintiff but could not recall anything specific about Beville's interview.  (Strickland

Dep. at pp. 81-86).

    Jones made the decision to hire Beville.  Human Resources was informed on August 10,

2005, that Beville was selected for the position.  (Hale Dep. at pp. 142-43).  Jones initially

testified the "tipping point" for his selection of Beville was the applicant's "relationships he had

---

[37]Strickland's deposition is located at document 43, exhibit 35 in this court's record of the case.

18

developed with the folks on campus." (Jones Dep. at pp. 169-70). Jones was also aware that the

plaintiff had "good relationships with lots of folks," too. (Jones Dep. at pp. 170-71). Jones

testified that he selected Beville over the plaintiff for the position because of Beville's positive

impact on the housing system and his references. (Jones Dep. at pp. 208-09). Additionally,

Jones noted that he had received positive references and comments from people that were

working with Beville; Beville showed the ability to problem solve and quickly resolve an issue

when necessary; and Jones thought that Beville's efforts and relationships would be the best for

Jones's department. (Jones Dep. at pp. 208-18). Jones also noted Beville's enthusiasm and

willingness to do whatever it took to solve problems and Beville's thoughtful interview answers

that demonstrated a focus on the future and ways to make the residential experience for students

better. (Jones Aff. at ¶ 7).

Jones gave the following reasons for the non-selection of the plaintiff: the plaintiff cut

him off several times during the interview; the plaintiff did not answer his questions during the

interview; Jones also said that one of his goals was to address stagnant behavior of the

department and when the plaintiff was asked about this, she only mentioned "getting the RAs to

do their jobs." Jones disagreed with this approach to reform; Jones said one of his preferences

was having people on site to be on a team and be "willing to get their hands dirty . . . Willing to

. . . stand shoulder to shoulder with the facilities guys. That's what the system needs." Plaintiff's

attitude was to "turn the work order in and . . . let those guys handle it." This was not the

"response [Jones] was looking for;" Cashman "commented . . . that the way the University

operated residence halls when she was an employee at the University was a good system." Jones

"intended to change the old way of doing things" and "did not expect to hire a person who was

focused on the past;" Cashman "did not demonstrate knowledge of the construction aspects of new residence halls and because the University was entering the initial stages of an aggressive increase in on-campus housing, [Jones] needed a person in this position who was familiar with construction issues;" and Cashman was "detached in her interview as compared to the other candidates, who were much more willing to be active participants in [Jones's] plans to improve the residential communities on campus." (Jones Dep. at pp. 208-18; Jones Aff. at ¶ 8).  The reasons set forth on the University's official posting summary for Beville's selection are:

> Of the 3 candidates we invited to interview on campus, Andy had the most balanced experiences with construction/renovation, furnishings and general facility issues.  He also was the candidate who had the most experience determining the needs of and working with students concerning facility issues.  He was also the candidate who represented the need for this position to be able to regularly interact with students, staff, contractors, and senior university administrators.

(Doc. 43 at Ex. 40).  The official reason set forth for the plaintiff's non-selection for the position was, "Less relevant experience than applicant hired."  (Doc. 43 at Ex. 41, p. 2).

### F.       Administrative Procedures (E.E.O.C.)

On February 2, 2005, the plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission alleging sex discrimination against the University.  (Doc. 43 at Ex. 44).  The defendant responded to the charge stating, in part, that McReynolds made the decision to outsource the plaintiff's job duties and to eliminate the plaintiff's position.  (Doc. 43 at Ex. 45, p. 1).

## III.   MOTIONS TO STRIKE

### A.       The Plaintiff's Motion to Strike Portions of David Jones's Affidavit

The plaintiff asks the court to strike portions of David Jones's affidavit which was offered

in support of the motion for summary judgment.  The plaintiff asserts that it contains statements

that are inconsistent with Jones's deposition testimony.  (Doc. 41 at pp. 3-4) (Citing *Knox v.*

*Brunbridge Shirt Corp.*, 942 F. Supp. 522, 533 (M.D. Ala. 1996)).  Specifically, the plaintiff

asserts that paragraphs 7 and 8 should be struck from Jones's affidavit because they contain

reasons for Jones's preference for Beville over the plaintiff that Jones did not testify to in his

deposition.  This, the plaintiff argues, amounts to a "sham offered solely to create an issue of fact

despite having previously given clear answers to unambiguous questions in his deposition which

negated the existence of any such issues of material fact."  (Doc. 41 at pp. 3-4).  The court

disagrees.

    The Eleventh Circuit addressed "sham" affidavits in *Tippens v. Celotex Corp.*, 805 F.2d

949, 954 (11th Cir. 1986):

> An affidavit may only be disregarded as a sham "when a party has given clear
> answers to unambiguous questions which negate the existence of any genuine
> issue of material fact . . . [and that party attempts] thereafter [to] create such an
> issue with an affidavit that merely contradicts, without explanation, previously
> given clear testimony."  *Van T. Junkins and Associates v. U.S. Industries*, 736
> F.2d 656 (11th Cir. 1984).  Every discrepancy contained in an affidavit does not
> justify a district court's refusal to give credence to such evidence.

In its response to the plaintiff's motion to strike, the defendant sets out the portions of the

affidavit that the plaintiff moves to strike alongside the allegedly inconsistent portions of his

deposition testimony.  The court does not find sufficient inconsistency between the two sources.

Because Jones's affidavit testimony is not a "transparent sham," the court has no basis on which

to strike the requested portions.  Therefore, the plaintiff's motion to strike is due to be denied.

**B.    Defendant's Motion to Strike Certain of the Plaintiff's Factual Citations**

    The defendant moves to strike the following passages from the plaintiff's brief for the

following reasons:

(1) "Bill McReynolds, the Interim Director of Facilities, and Turnipseed agreed with the proposal [to upgrade the plaintiff's job]. (Wolfe 59:1-14; 69:7-70:15)." The defendant argues that this assertion is hearsay and that it has no relevance because Dan Wolfe was not a decisionmaker. The court agrees that the assertion is due to be struck to the extent the plaintiff attempts to establish the truth of the matter asserted. Wolfe testified in his deposition to the reaction of Turnipseed and McReynolds to his suggestion to create a University-wide Interior Design position. Specifically, Wolfe testified that "in both cases it was pretty positive. I think they both agreed with my philosophy that it would be good to provide those [interior design services]." (Wolfe Dep. at p. 69). He did not specifically assert that they told him they agreed. If he had testified to such, it arguably would be irrelevant hearsay. To the extent the plaintiff attempts to construe Wolfe's testimony as an assertion of fact, it is due to be struck because it is speculative as to what he thinks.

(2) "During Wolfe's discussions with Perry he never mentioned that elimination of plaintiff's position was being considered. (Perry 52:12-53:1)." (Doc. 42 at p. 4). The defendant argues that this assertion is due to be struck based upon hearsay grounds and it is not relevant as it relates to two University employees unconnected with the decision to increase the plaintiff's job duties.  The court disagrees that the assertion constitutes hearsay. Perry testified that Wolfe never mentioned the elimination of the plaintiff's position to her.

(3) "In September 2004 the plaintiff met with Dr. Lynda Gilbert, the Vice President of Finance, regarding her job upgrade and was told the new Vice President would decide the plaintiff's new job title. (Cashman 148:1-22; 150:2-151:15; See Deposition of Dr. Gilbert,

submitted herewith as Exhibit 9, pp. 18:5-17).["]38  To the extent the plaintiff offers this assertion

and expects the court to attribute it to Dr. Gilbert's testimony, it is clearly due to be struck as it is

unsupported by the record.  To the extent the plaintiff supports the assertion merely with what

she alleges Dr. Gilbert said to her, it is arguably admissible under 801(d)(2)(D), and not due to be

struck.

(4)  "Brandon also discussed the upgrade and expansion of the plaintiff's position with

Dr. Gilbert who was 'very positive' about the change.  (Brandon 64:11-66:3)."  The defendant

moves to strike this portion of Brandon's testimony based on hearsay and relevance and argues

---

[38]This cite, like numerous cite references in the briefs, is incorrect.  Dr. Gilbert's testimony on speaking with the plaintiff about the job upgrade is on pp. 57-58 of her deposition.  The actual testimony is as follows:

Q.   Did you know that there had been a recommendation that there be an upgrade of her job?

A.   Not from Mr. Turnipseed.  I think Linda may have mentioned it in a conversation with me.

Q.   Well, had you received a letter that - - from Mr. McReynolds talk - - discussing that about saving money because of the outside - - using outside interior designers?

A.   Yes.  He recommend - - and I had already been contemplating doing that.  He and I had talked about it.

. . .

Q.   Well, tell me the conversations that you and he had had about upgrading Linda's job.

A.   Bill and I never had any conversations that I remember about upgrading her job.

Q.   Well, what kind of conversation had you had?

A.   He and I had discussed outsourcing the design function for the University and getting an outside firm in to do that for us.

Q.   So you had not discussed with him or received any letters from him concerning the upgrade of Linda - - of Linda Cashman's position?

A.   I don't remember receiving anything on the upgrade of Linda Cashman's position.

(Gilbert Dep. at pp. 57-58).

that Brandon's perception that Gilbert's reaction to the job upgrade was "very positive" is speculation. The court disagrees. Brandon simply testified to what she perceived Gilbert's reaction to be. The court does not find that her perception would be inadmissible at trial and thus does not find that testimony due to be struck here.

(5) "McReynolds and Brandon also discussed the upgrade of the plaintiff's position and a corresponding move of the plaintiff's office. (Brandon 39:3-40:17; 42:14-43:21)." The defendant objects to this testimony on the basis of hearsay and relevance. Although the testimony might not be relevant, the court declines to strike it at this juncture.

(6) "The plaintiff was repeatedly told by Turnipseed, McReynolds and Wolfe that the upgrade of her position was being processed and they were intent on making it happen. (Cashman 135:9-136:11)." The defendant objects on the basis of relevance and lack of foundation. The court agrees that the statement is not supported by the record, except to the extent Cashman asserts it. However, the court declines to strike the statement.

(7 & 8) "On October 21, 2004, Bill McReynolds met with the plaintiff and told her he was recommending to Dr. Gilbert the title of Director of Design for the plaintiff's new position, and that the position would not be funded until January or February of 2005 but that he needed the plaintiff to go ahead and start performing the expanded job duties of that position at that time due to the number of ongoing projects. (Cashman 127:8-128:14; Brandon 49:17-50:22; Wolfe 76:16-78:1). The defendant objects to the portions attributable to Brandon and Wolfe. To the extent the plaintiff attempts to make this assertion attributable to either Brandon or Wolfe, it is not supported by the record. While the court does not find the assertion is due to be struck, it does find that the references to Brandon and Wolfe's depositions are. The complained of

24

statement in this objection will only be attributed to the plaintiff.

(9) "In November 2004 the plaintiff received an anonymous phone call in which she was informed that the caller had overheard McReynolds talking to Wolfe about Brandon and calling Brandon a "black bitch."  (Cashman 165:6-166:23).  McReynolds then asked Wolfe if he [Wolfe] could perform the plaintiff's job.  (*Id*.)."  This passage is rank hearsay and due to be stricken.

(10) "The residence halls were kept in good shape . . . . (See . . . Exhibit 15 and Exhibit 47)."  The defendant argues that this statement lacks foundation and is unsupported by any testimony.  The court agrees.  Exhibit 15 contains a raise allocation form, which does not reflect the condition of the residence halls and Exhibit 47 does reference the condition of the "halls" when there was an issue concerning a foul smell in the area.  The statement is due to be struck as an overstatement of what the exhibit shows.

(11) "Brandon testified that the plaintiff's termination for alleged 'outsourcing' did not make any sense to her in light of the actions taken to expand Cashman's job duties and she questioned the decision [to Bill McReynolds] to no avail."  (Brandon 61:3-62:16).  The defendant argues that this statement is irrelevant and lacks foundation.  The court agrees that the statement has no relevance and is due to be struck.  It is also a conclusory mental operation.

(12) "McReynolds testified that he made the decision to "eliminate" the plaintiff's position without consulting anyone.  (McReynolds 53:4-54:1; 56:23-57:5)."  The defendant argues that this statement is a conclusion that is not supported by the evidence.  The court disagrees.  McReynolds testified repeatedly that he eliminated the plaintiff's position. Regardless of the veracity of the statement, it is, in fact, attributable to McReynolds.

(13) "When a position is being considered for elimination, such a proposal should be

brought to the attention of an [sic] Human Resources partner and then to the Employee Relations

Consultant for evaluation to insure [sic] the proper steps are followed.  (See Deposition of

Sharon Hale, submitted herewith as Exhibit 18, pp. 38:16-39:14)."  The defendant objects on the

basis of relevance, lack of foundation, and speculation.  The court finds the statement to be

unsupported by the relevant portion of deposition testimony cited and a mischaracterization of

the deponent's testimony.  The statement is, therefore, due to be struck.

(14) "The University has a progressive discipline policy and a corresponding grievance

procedure which allows an employee to address any improper discipline decisions and

dismissals.  (Harris 62:5-63:10; Gilbert 11-14)."  The defendant argues that the statement is not

relevant.  The court agrees.  There is no allegation that the plaintiff was terminated for cause, and

therefore, needed disciplining.  The statement is due to be struck.

(15) "Following her termination, the plaintiff checked for the RFP on the University

Facilities website twice per day and no such RFP was ever posted.  (Cashman 193:20-196:20)."

The defendant objects to this statement because it is speculation on the plaintiff's part.  The court

agrees.  The plaintiff's deposition testimony states that she did not see the RFP.  To the extent

this statement is used to assert that the RFP was not posted, it is due to be struck.  However, the

plaintiff's statement that she checked the website twice per day and never saw any posting is

allowed.

(16) "At no time was the plaintiff afforded an appeal opportunity, mediation, hearing or

any other form of dispute resolution as outlined by the University's employment policies.  (See

Staff Dispute Resolution Policy, submitted herewith as Exhibit 49)."  The defendant argues that

this is a conclusory statement that is unsupported by any factual citation.  The defendant is

correct.  The statement is due to be struck.  However, even if allowed, it is not relevant as this was not a disciplinary situation.

(17) "Vendors were informed by Wolfe that all interior design was being handled 'in house with University employees' and he served as their contact person.  (Cashman 184:8-185:13; 190:3-19)."  The defendant objects to this statement on the basis of hearsay.  The court agrees.  This statement is clearly based on hearsay and is due to be struck since there is no evidence that the plaintiff was present when the comments purportedly were made.

(18) "In the first few months following the plaintiff's termination, Wolfe was seeking help from Dr. Carolyn Callis, the head of Clothing, Textiles and Interior Design Department, in order to specify the design and furnishings for the new residence halls.  (Cashman 185:18-186:22; Ex. 21)."  The defendant objects on the basis of hearsay.  This is clearly information the plaintiff would not have known unless told to her by a third-party, and is due to be struck.[39]

(19) "In December 2004 Andy Beville was hired [] by the University to perform the plaintiff's prior duties including maintenance, furniture selection, upholstery, meeting with vendors, tours of the residence halls, replacement/repair work orders, conducting student focus groups, standardization of furniture, inventory, and other duties set out in the plaintiff's job description.  (Cashman 204:20-208:17; 214:4-216:4; see also provisions of Beville that are cited.)."  The defendant objects that this portion is hearsay and calls for speculation.  Specifically, the defendant asserts that the plaintiff is making conclusory assertions about Beville's work and that she has no personal knowledge of Beville's work.  Additionally, the

_____

[39]The plaintiff did not testify as to how she knew this.

27

defendant argues that the other citations do not support the "jumbled conclusions" that are made. To the extent the statement provides that "Beville was hired . . . to perform the plaintiff's prior duties . . .," it is due to be struck. The cited portions of the depositions do support the conclusion that Beville was hired in December 2004, and that he performed some of the same duties that the plaintiff performed. However, the cited portions do not support the conclusion that Beville was hired to perform all the plaintiff's previous duties. With that clarification, the court will allow the statement.

(20) "This position was not posted because the job description 'evolved' into the Director of Housing Position [sic] now held by Beville. (Lawrence 74:16-76:1)." The defendant asserts that this statement mischaracterized Lawrence's testimony. The court agrees. The cited testimony makes no mention of a position being posted and does not support this conclusory statement. The statement is, therefore, due to be struck.

(21) "Outside vendors were likewise informed that all specifications and interior design functions would be handled 'in house, by University employees,' and that Beville and Wolfe would be 'doing the design on new projects.' (See Correspondence of Howard Sax,[40] submitted herewith as Exhibit 26)." The defendant objects on the basis of hearsay. The statement is due to be struck as it is hearsay.

(22) The next objected to citation covers two separate passages: "Beville testified these were items for which the plaintiff had previously been responsible. (Beville 146:20-147:7)." "Beville continues to perform the plaintiff's prior job duties, but under the new title of Associate Director of Housing Operations. (Beville 146:20-147:7)." The defendant objects that these

---

[40]Howard Sax was a furniture vendor that the plaintiff dealt with while working for the University.

statements are unsupported speculation, mischaracterized, and overstated.  Specifically, the defendant asserts that the plaintiff uses this testimony to prove that Beville was performing her prior job when the testimony only discusses furniture selection for one residence hall.  (Doc. 49 at p. 3).  The court agrees.  The plaintiff continues to make conclusory assertions that are not completely supported by the testimony.  To the extent the statements are used to support the conclusion that Beville was hired into the plaintiff's former job, they are due to be struck.

(23) "Molly Lawrence, the Assistant Vice President for Student Affairs, testified that Beville had held his current position of Associate Director of Housing Operations since May 2005, and had assumed the duties of that position before it was ever posted at the direction of David Jones.  (Lawrence 46:2-6; 75:15-78:8)."  As the defendant points out, this statement mischaracterized Lawrence's testimony.  To be clear, Lawrence testified that "[h]e was doing some responsibilities, ***not all of them***," and that Beville was not preselected for the position.  (Lawrence Dep. at p. 76)(emphasis added).  The statement is due to be struck to the extent it is inconsistent with that just cited.

(24) "Following the plaintiff's termination, the campus-wide design duties which had been an anticipated upgraded [sic] of the plaintiff's position were given to Garnett Hatchett, a University employee who was hired on February 15, 2002.  (Cashman 202:21-203:5; 223:16-229:5)."  The defendant objects to this statement on the basis of relevance and hearsay.  The court agrees that the statement amounts to hearsay made by "people who work there [at the University]," and finds the statement to be conclusory.  Additionally, it appears that the plaintiff did not have first hand knowledge concerning this matter.  It is, therefore, due to be struck.

(25) "Jones was informed they needed to hire someone to fill the Associate Director of

Housing Operations position because the department had given facilities inventory and purchasing duties which it had not previously held due to a restructuring.  (Jones 113:3-23). Jones was informed these duties needed to be addressed because the position that used to cover them was no longer there; this was the plaintiff's position.  (*Id*.)."  The defendant objects that these statements are a mischaracterization of Jones's testimony.  The court finds that the portion of the statement that reads "Jones was informed they needed to hire someone to fill the Associate Director of Housing Operations position," is due to be struck because it is wholly unsupported by the cited portion of testimony.  The remainder of the statement is, however, supported by Jones's testimony and not due to be struck.

(26) "However the job functions of the plaintiff's position were not eliminated and needed to be performed.  (Jones 114:1-117:2)."  The defendant objects that the statement is a micharacterization of the deponent's testimony.  The court disagrees.

(27) "Per Jones's request in March 2005, Beville drafted the job description and the PIQ (Position Inquiry Questionnaire) for the Associate Director of Housing Operations position[]. (Beville 209:3-211:1; 239:1-8; Jones 147:15-149:11)."  The defendant objects again on the micharacterization of the testimony.  The court agrees.  The testimony is that Beville drafted and/or assisted in drafting a job description.  There is no testimony that Beville specifically drafted the job description for the Associate Director of Housing Operations.

(28) "On May 13, 2005, the plaintiff saw the Associate Director of Housing Operations posted on the UA website and immediately applied on-line ~~because the job consisted of the duties of her prior position with a new title and moved back to the Residential Life department, where it had formerly been when Cashman initially held the position.~~[]  (Cashman

30

212:22-213:15; 255:7-16).”  The defendant objects that the statement is conclusory and unsupported by the testimony.  While the court finds that the statement is supported by the testimony, it also finds that the testimony is merely her conclusory opinion.  The stricken through portion of the testimony is due to be struck from the record.

(29) “Jones then informed Lawrence via e-mail that Cashman had been the first person to apply for the position on May 13, 2005, although Jones had already placed Beville in the position on May 11, 2005.  (Lawrence 123:3-124:7; see e-mail submitted as Exhibit 31, p. 5).”  The defendant objects that the assertion that Beville was placed in the position in May 11, 2005, is a mischaracterization of the testimony.  The court disagrees.  Lawrence’s testimony is that someone placed Beville in the position on May the 11th.  (Lawrence Dep. at p. 124:3-5).

(30) The defendant next objects to two pages of text having to do with Hale and Brandon’s opinions of the applications on the basis of relevancy.  Because the defendant’s objection is unclear, it is due to be overruled.

(31) “Human Resources is responsible for culling out applicants that do not meet a position’s qualifications, but with regard to the Associate Director of Housing Operations position, Hale had received a special request from Jones to allow these individuals to be reconsidered for the position despite the fact that they did not meet the minimum job qualifications.  (Hale 65:6-70:6).”  The defendant objects that the assertion is a mischaracterization as Jones only asked for reconsideration of one applicant, not “these individuals,” as characterized in the plaintiff’s brief.  Hale’s testimony actually reflects that she believed the status of Tim Burton and Christine Walker had been changed.  (Hale Dep. at pp. 66-68).  Hale further testified that Human Resources can change the status of a candidate that is

31

automatically culled out by the computer if a department is really interested in that candidate or if the department felt the candidate met the minimum qualifications.  (Hale Dep. at pp. 65-70).  With those clarifications, the statement is not due to be struck.

(32) The defendant next objects to pages 17-21 of the plaintiff's brief and to "several" factual citations contained therein.  The court declines to assume what specific portions thereof the defendant wishes to strike.  Furthermore, the court is capable of determining what factual citations are material in its assessment of the case.

(33) "At this time, Hale was aware that Cashman had filed an EEOC Charge against the University.  (Hale 103:2-9)."  The defendant objects on the basis of relevancy.  The court finds that objection is due to be overruled.

(34) The defendant objects to the portion of the plaintiff's statement of facts recounting Mark Foster's recollection of the plaintiff's description of her work experience on the basis of relevancy because Foster was not a decisionmaker.  The court overrules the objection.

(35) "Via the plaintiff's interview and her resume, Jones was aware that the plaintiff had been performing the duties of the posted job for twenty years.  (Jones 99:23-100:13)."  The defendant objects and the court agrees that this statement is stretching what Jones, in fact, said.  Jones, however, did confirm that Linda Cashman told him she'd been doing the work for twenty years.

(36) "Since Beville has been placed in the Associate Director of Housing Operations position, he has been repeatedly written up by Janie Fowler for violations of the fire/safety codes.  (Cashman 218:20-220:21)."  The defendant objects that the plaintiff has no personal knowledge of this and can only base such a statement on hearsay.  The court agrees.  The plaintiff does not

even claim to have personal knowledge of the assertion but instead knows of it through her
"people" at the University.  The footnote is due to be struck.

In accordance with the foregoing, the undersigned finds that the defendant's motion to
strike is due to be granted in part and denied in part.

## MOTION FOR SUMMARY JUDGMENT

### Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the declarations, if any, show that there is
no genuine issue as to any material fact and that the moving party is entitled to a judgment as a
matter of law."  FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct.
2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden
to show the district court, by reference to materials on file, that there are no genuine issues of
material fact that should be decided by trial.  Only when that burden has been met does the
burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact
that precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.
1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142
(1970).

The movant can meet this burden by presenting evidence showing there is no dispute of
material fact, or by showing that the nonmoving party has failed to present evidence in support of
some element of her case on which she bears the ultimate burden of proof.  *Celotex*, 477 U.S. at
322-23; *see* FED. R. CIV. P. 56(a) and (b).  Once the moving party has met its burden, Rule 56(e)
"requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the

33

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.  The nonmoving party

need not present evidence in a form necessary for admission at trial; however, the movant may

not merely rest on the pleadings.  *Id*.

After a motion has been responded to, the court must grant summary judgment if there is

no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c).  The substantive law will identify which facts are material and which are

irrelevant.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202

(1986).  "[T]he judges's function is not himself to weigh the evidence and determine the truth of

the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at

249.

## IV.   DISCUSSION

In her complaint, the plaintiff asserts gender discrimination, retaliation, and due process

violations.  The plaintiff further alleges that she was terminated and replaced by a male or males,

was retaliated against as a result of filing an EEOC charge, and was deprived of her procedural

due process rights.

### A.   Analytical Framework for Title VII Gender Discrimination

The plaintiff brings her discrimination claim based upon the elimination or termination of

her position as Interior Designer.  To defeat summary judgment, the plaintiff must first establish

a *prima facie* case of discrimination.  "Demonstrating a prima facie case is not onerous; it

requires only that the plaintiff establish facts adequate to permit an inference of discrimination."

*Holifield v. Reno*, 115 F.3d 1551, 1562 (11th Cir. 1997)(citations omitted).  If the plaintiff is able

34

to establish a *prima facie* case, the defendant must come forward with "legitimate nondiscriminatory reasons for the adverse employment action."

Once the defendant has articulated its legitimate reasons for the plaintiff's termination, the court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)(citing *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).  This must include an evaluation of "whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Combs*, 106 F.3d at 1538.  If it is "determine[d] that a reasonable jury could conclude that the employer's proffered reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action." *Id.*

In evaluating whether the plaintiff has demonstrated pretext, the court must examine each of the proffered "legitimate reasons" for the employment decision and determine whether the plaintiff has cast sufficient doubt on each to permit a reasonable fact finder to conclude that the purported "legitimate reasons were not what actually motivated its conduct." *Combs*, 106 F.3d at 1538-39. *See Mora v. University of Miami*, 15 F. Supp. 2d 1324, 1336 (S.D. Fla. 1998)(A plaintiff, nevertheless, can survive summary judgment by presenting evidence demonstrating a

genuine issue of material fact as to the truth or falsity of each of the employers' legitimate, nondiscriminatory reasons), *citing Evans v. McClain of Georgia, Inc*., 131 F.3d 964-65 (11th Cir. 1997)(citing *Combs*, 106 F.3d at 1530-32).

In this case, the parties dispute whether the plaintiff's position was eliminated or whether the plaintiff was terminated.  The plaintiff contends that she can establish a *prima facie* case in either instance and that the defendant's proffered legitimate bases for her job elimination or termination are pretext for unlawful discrimination.  Because the elements of the *prima facie* case are somewhat different in those two situations, the court will address both in turn herein.

### 1.      Discriminatory Termination

"A prima facie case of discriminatory discharge may be established in different ways." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984).  For instance, the plaintiff can establish her case by showing: (1) she was qualified and yet was fired and then replaced by someone outside her class; (2) she was fired when others outside her class with similar qualifications were retained; or, (3) she was fired premised on "differential application of work or disciplinary rules."  *Id*.  In this case, the plaintiff argues that she was qualified for her position but was fired and replaced by someone outside her protected class. (Doc. 42 at p. 25).  The only disputed element of the plaintiff's *prima facie* case is whether she was replaced by someone outside her protected class.  The plaintiff argues that she has presented "substantial evidence" that she was temporarily replaced by both Dan Wolfe and Andy Beville. (Doc. 42 at p. 26).  The defendant retorts that Wolfe and Beville were temporarily involved in furniture selection for the Riverside residence hall, but that two female employees, Susanna Johnson and Molly Lawrence, aided them with the furniture selection.  Additionally, the

defendant asserts that another female employee, Garnette Hatchett, was performing some of the duties that the plaintiff previously performed that did not involve furniture selection.  (Doc. 32 at p. 18).

> The plaintiff responds, in conclusory fashion, that
>
>  [t]he red herring offered by the defendants that Wolfe and Beville were assisted by female employees on a committee in performing the plaintiff's job duties is without merit.  The evidence of record shows that prior to her termination, part of the plaintiff's job duties was to, likewise, serve on selection committees for residential furnishings, that this role remained after her termination, and that this role was then assumed by Wolfe and Beville.  (Lawrence 57:15; 64:18-65:10; Beville 168:11-18; 170:22-171:8).  The fact that female employees also served on these committees is irrelevant and this evidence only serves to further prove the extent to which Beville usurped the plaintiff's job duties and roles.

(Doc. 42 at pp. 28-29).  Additionally, the plaintiff argues that Hatchett performed the job duties that the plaintiff would have performed had her job been expanded but that she was not actually yet performing any of these duties at the time of her termination.  (Doc. 42 at p. 29).

Specifically, the plaintiff argues that:

> [T]he defendants' reference to Garnett Hatchett is an immaterial tangent.  The plaintiff's testimony is that Hatchett began performing the expanded job duties which the plaintiff had anticipated to be assigned prior to her termination.  The plaintiff was not actually performing these duties as of her termination, and thus, the performance of these duties by a female is irrelevant to the actual replacement of the plaintiff's position as it existed at the time of her termination.

(Doc. 42 at p. 29).  In a footnote, the plaintiff goes on to say that "hiring another person to perform these anticipated expanded duties belies the defendants' alleged "outsourcing" reason for the elimination of the plaintiff."  (Doc. 42 at p. 29 n.28).

What the plaintiff fails to acknowledge, however, is that her assertion that Hatchett (a female) was hired to perform interior design services belies her argument that she was terminated

on the basis of gender.  With regard to furniture selection, there is absolutely no evidence that

either Dan Wolfe or Andy Beville did any furniture selection beyond the Riverside project.

Molly Lawrence testified that the plaintiff's non-interior design duties were assigned to other

employees and that she suggested a position in Student Affairs for inventory control and other

non-interior design duties, which the plaintiff had been performing in addition to her interior

design duties.  Specifically, Lawrence testified that:

> 4.     When I learned that Cashman had lost her job because the entire interior
> design function for the University[41] was to be outsourced, and Coress Brandon
> informed me that Cashman was providing ancillary services, I saw this as an
> opportunity to bring those responsibilities and duties, to add other responsibilities
> to those duties, and to reinstate a position in Student Affairs.  Such a position had
> been discussed before, and had formerly existed.

> 6.     In the meantime, however, there were two more immediate challenges.
> The more important was the furniture for the Riverside residence halls, which had
> to be selected and purchased because students had been assigned to that hall for
> the Fall 2005 term beginning in August.  The second challenge was I needed a
> person immediately to perform the duties of the position I had agreed to activate
> in Student Affairs, which included some duties that I understood had been
> performed by Linda Cashman, ancillary to her designer duties.

> 7.     . . .

> 8.     After Beville began his temporary position, I was asked by Susanna
> Johnson to help with the selection of the furniture for the Riverside residence hall.
> Beville was a member of a committee along with Dan Wolfe, Susanna Johnson,
> and me.  The furniture selection for Riverside by this committee was a one-time
> event necessitated by Cashman no longer being employed at the University and by
> the necessity to make this decision promptly, prior to the time that the University
> could outsource the function of interior design.  Now that the outside contractor,
> Kahn South, has been selected, furniture selection for the residence halls is
> coordinated by that firm, under the coordination of Susanna Johnson.  Neither
> Beville nor Wolfe perform the furniture selection function for the residence halls
> that was formerly the job of Cashman, except as indicated above for Riverside.

---

[41]Cashman only provided interior design services for the residence halls.  She was not responsible for interior design in
any of the other University buildings.  (Gilbert Aff. at ¶ 5).

(Lawrence Aff. at ¶¶ 4, 6 & 8).

In sum, the plaintiff simply has not established that any one person performed her job after she was terminated.  At best, the plaintiff has shown that several employees took over the functions of her job until the University effected the outsourcing of interior design services.[42] Furthermore, the person with authority to eliminate the plaintiff's position (Gilbert) is not the person with the authority to hire Beville (Lawrence).[43]  (Gilbert Aff. at ¶ 10; Lawrence Aff. at ¶¶ 5-7).

Although the job posting for the temporary position[44] cites that the temporary position

---

[42]Lawrence's testimony is consistent with this:

When I learned that Cashman had lost her job because the entire interior design function for the University was to be outsourced, and Coress Brandon informed me that Cashman was performing ancillary services, I saw this as an opportunity to bring those responsibilities and duties, to add other responsibilities to those duties, and to reinstate a position in Student Affairs.  Such a position had been discussed before, and had formerly existed.

Therefore, at a meeting held with Cashman's supervisor, Coress Brandon, and others in late 2004 to discuss how to assign the responsibilities of Cashman, I suggested that I would activate a position in Student Affairs to assume, among other things, the inventory control and other non-interior design duties that had been performed by Cashman.  I eventually obtained permission to implement the position, which became the Associate Director for Housing Operations.

(Lawrence Aff. at ¶¶ 4-5).

[43]Although the plaintiff asserts in her brief that McReynolds terminated her (interestingly, with regard to her due process claims, the plaintiff asserts that McReynolds, Harris, Gilbert, and Witt all played a role in her termination) and McReynolds testified that he decided to outsource the design functions, Gilbert clearly testified that McReynolds simply did not have the authority to terminate and that she was the ultimate decisionmaker.  (Gilbert Aff. at ¶ 10).  Furthermore, the contract entered into between the University and Hoar Construction explicitly states that:

It is expressly understood that Mr. McReynolds has no authority to make personnel decisions that involve changes in pay, job positions, promotions, transfers, or disciplinary sanctions, including warnings, suspensions, or terminations, that involve University employees.

(Doc. 33 at Ex. 4A).  Additionally, Coress Brandon testified that McReynolds told her that he had "reviewed" the outsourcing with Dr. Gilbert and Human Resources prior to his meeting with the plaintiff wherein he informed her that her position was being eliminated.

[44]The plaintiff attempts to create a factual dispute over whether the position was actually temporary by stating that Beville was hired to assume the plaintiff's tasks and that Beville was not aware that the University was outsourcing the interior design functions at the time he was hired.  (Doc. 42 at p. 29).  Such an assertion actually works to the contrary.  The fact that Beville had no information regarding outsourcing serves more to bolster the fact that he was not involved in interior design than to undermine it.  The plaintiff's attempt to support her assertion that the temporary position was the same as her former position by citing an ambiguous portion of Gilbert's testimony also fails.  For example, the plaintiff asserts that "[i]t is also undisputed

will be "assuming tasks formerly completed by Asst Dir of Facilities Linda Cashman," it does

not support the plaintiff's theory that the position is the wholesale assumption of Cashman's

former duties.  To the contrary, the posting for the temporary Coordinator for Residential

Communities is justified by the "departure of the Asst Dir for Planning and Design," and calls for

a Masters degree in Higher Education, Student Affairs, Counseling, or related field.  (Plaintiff's

Ex. 25 at pp. 2-3).  The only interior design functions the posting cites are the "duties of that

position associated with residence hall furniture inventory."  (Plaintiff's Ex. 25 at p. 9).  The only

"evidence" the plaintiff has in support of her assertion that she was replaced by Beville in the

same position that she had previously occupied is her own self-serving testimony based on

hearsay and conclusory assumptions.  Such testimony is not sufficient to defeat summary

judgment.  Because the plaintiff has not established that the temporary position that Beville filled

was the same as her former position, she has failed to show that she was *replaced* by someone

outside her protected class, and thus, has failed to establish a *prima facie* case of gender

---

that the plaintiff's prior job description was utilized in creating the job description for the Associate Director of Housing Operations position Beville now holds."  Gilbert's actual testimony is that she asked Coress Brandon for a copy of the plaintiff's position description.  While one might infer that Gilbert took the plaintiff's position description into account when providing input into the ADHO position description, reaching a conclusion that the description was utilized in creating the job description for the ADHO position is far from undisputed based upon that fragment of Gilbert's testimony.  Likewise, the plaintiff's assertion that "[a]nd perhaps most telling, is Beville's own testimony that as of the date of his deposition, April 13, 2006, he was still performing duties which had previously belonged to Cashman but under the new title of Associate Director of Housing Operations (Beville 146:20-147:7), is stretching Beville's testimony beyond recognition.  Beville's testimony, verbatim, from the cited portion of his deposition is:

    Q.    Well, who had been in - - responsible for the furniture selection prior to your being called upon for the immediate need of ordering some mattresses?

    A.    During that meeting it wasn't discussed.

    Q.    Uh-huh.

    A.    Since that meeting I've learned it was your client that took care of those items.

(Beville Dep. at pp. 146:20-147:7).  Nothing in that testimony supports the plaintiff's conclusory assertion.  Because the plaintiff's brief contains inaccuracies such as this, determining the actual undisputed facts for purposes of resolving the instant motion has proved to be an arduous task.

discrimination.

To the extent the plaintiff attempts to establish a *prima facie* case of discrimination based upon the ADHO position,[45] the record clearly reflects that that position is distinct from her former position. Specifically, Susanna Johnson and Sharon Hale testified that the ADHO does not include any interior design functions and Hale testified that 70% of what the plaintiff did has been outsourced to Kahn South. (Hale Aff. at ¶¶ 4-5; Johnson Aff. at ¶¶ 7-10).

**2.      Job Elimination**

Alternatively, the plaintiff asserts that she can establish a *prima facie* case of discriminatory job elimination. The standard for establishing a *prima facie* case is somewhat different in an elimination than it is in a termination.

> In a reduction-in-force (RIF) case and where a position is eliminated in its entirety: the plaintiff establishes a prima facie case [of [gender] discrimination] by demonstrating (1) that she was in a protected . . . group and was adversely affected by an employment decision, (2) that she was qualified for her current position or to assume another position at the time of discharge, and (3) evidence by which a fact finder could reasonably conclude that the employer intended to discriminate on the basis of [gender] in reaching that decision. *Jameson v. Arrow Co.*, 75 F.3d 1528, 1531-32 (11th Cir. 1996).

*Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1344 (11th Cir. 2003). For summary judgment purposes only, the University concedes that the plaintiff has established the first two elements. (Doc. 32 at p. 17). The defendant asserts, however, that the plaintiff can not establish "evidence by which a factfinder might reasonably conclude that the employer intended to discriminate . . . in reaching the decision at issue." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th

---

[45]The plaintiff does not point to this position in support of her argument in her brief that her termination was discriminatory, nor did she file an EEO charge regarding this position. However, at times, the plaintiff alludes to the ADHO position when addressing her discrimination charge. For the sake of clarity only, the court reiterates that it finds that the failure to put the plaintiff in the ADHO position is not part of her discrimination charge.

Cir. 1990).[46]  Specifically, the defendant asserts that the elimination of duties and the elimination of a position are not the same.  The plaintiff's position was eliminated, but the duties of her position were not.  According to the defendant, the majority of the plaintiff's duties were ultimately outsourced.  In the interim period before the outsourcing was completed, those duties were shifted to other University employees, as set out previously.  Because her position was eliminated, however, the plaintiff cannot show that there was a position available at the time she was terminated.[47]

Following the plaintiff's termination, oversight of the residence halls was shifted from the Financial Affairs department to the Student Affairs department.  Those responsibilities became Lawrence's rather than Gilbert's.  The new position created in Lawrence's department retained some of the plaintiff's former job responsibilities, but only a minor portion of them related to furniture inventory control.

There is simply no evidence that would establish that the plaintiff's job elimination had anything to do with her gender.  Although the plaintiff argues that Beville took over her job duties, the fact remains that the plaintiff was not replaced.  Her duties were dispersed among several University employees.  Additionally, as the court in *Langston v. Carraway Methodist Hospitals of Alabama, Inc.*, 840 F. Supp. 854, 866 (N.D. Ala. 1993), considered, the fact that

---

[46]The Eleventh Circuit has reasoned that "where a job for which the plaintiff is qualified, and for which the plaintiff applies, is available at the time of termination, and the employer offers the job to an individual outside the protected . . . group, an inference of intentional discrimination is permissible." *Jameson v. Arrow Co.*, 75 F.3d 1528, 1532 (11th Cir. 1996). However, in the instant case, the plaintiff has not shown that there was a position available at the time she was eliminated.

[47]The plaintiff attempts to create evidence of gender discrimination in the hiring of the ADHO position.  (Doc. 42 at pp. 27-29).  However, the undisputed evidence shows that the ADHO position was not posted until May 2005, some six months after the plaintiff was terminated.  Therefore, that position was not one for which she could have applied at the time of her termination, *see Smith*, 352 F. Supp. 2d at 1344, and therefore not one appropriate for consideration of whether she can establish a *prima facie* case of gender discrimination in her termination.

Gilbert, the ultimate decisionmaker, is within the protected class makes it less likely that the decision was discriminatory.  "Those who are themselves within a protected group are less likely to discriminate that [sic] are those outside of the group.  *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466 (11th Cir. 1991)(persons inside protected group are more likely to be victims of discrimination than its perpetrators)."  *Langston*, 840 F. Supp. at 866.

For these reasons and the reasons set forth in the termination section, *supra*, the plaintiff has failed to establish that the University intended to discriminate against her on the basis of her gender in its decision to eliminate her interior design position.[48]  Even had the plaintiff established a *prima facie* case, the defendant has offered legitimate reasons for the elimination of the plaintiff's job.

### 3.    The University's Proffered Reasons for the Plaintiff's Termination

Lynda Gilbert testified that:

> For some time prior to November 2004, I had become concerned about the lack of a consistent design standard for the University buildings, residence halls and otherwise.  The campus look was not uniform, and did not possess a consistent visual image.  In addition, I was not impressed with the quality of the furniture and the designs. . . .
>
> Furthermore, the University was paying several hundred thousand dollars in fees to the architects/designers for interior design services.  Therefore, I began to consider ways to achieve the standards and uniformity . . . and to reduce the overall cost of this design function.
>
> Two alternatives occurred to me.  I could add staff . . . or I could outsource . . . . I chose to outsource because I believed that an outsourced entity could bring resources to the table that an in-house staff could not.

---

[48]The plaintiff herself testified that she thought McReynolds recommended her termination because he was upset with Coress Brandon.  While that might be an unfair reason for her termination, if true, it would not be violative of Title VII.  To the contrary, an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  *Nix*, 738 F.2d at 1187.

(Gilbert Aff. at ¶¶ 6-8).  Additionally, in a letter to Gilbert recommending the plaintiff's

elimination, McReynolds stated:

> While reviewing Facilities Personnel, and evaluating past performance and
> responsibilities, I have come to the conclusion that we need to consider a change
> in direction for Interior Design.  Currently we have one interior designer, Linda
> Cashman, who reports to Coress Brandon in Housekeeping.  Just recently, Linda
> has failed to perform as required on two major projects, The Loper Building and
> The Residence Halls.  She either did not or has not completed design, selection or
> ordering of furniture for these important projects.  She is impossible to keep track
> of, and cannot provide me with adequate details of her daily activities.
>
> It is my opinion that we should eliminate the position of Interior Designer
> immediately, and outsource all ID needs until we see the need for on-staff design.
> Our current staff, including Dan Wolfe and Hugh Kilpatrick can recruit and
> contract with outside sources who will be much more efficient that [sic] what we
> have seen lately.  Last year we outsourced over $300,000 in Interior Design on
> major Capital Projects.  So we are already doing it.  Why not eliminate some
> inefficiency.
>
> I hope you will take this in consideration, and if you concur, I will get with
> Charlotte Harris to start the process.

(Doc. 50 at Ex. 3).  Because the University has articulated legitimate bases for its decision to

terminate the plaintiff's position, the burden now shifts to the plaintiff to prove that the

defendant's proffered reasons are mere pretext for discrimination.  *See Texas Department of

Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207

(1981).  As already noted, the plaintiff can show pretext by pointing to "such weaknesses,

implausibilities, incoherences, or contradictions in the employer's proffered legitimate reasons

. . . that a reasonable factfinder could find them unworthy of credence."  *Combs*, 106 F.3d at

1539.  "The heart of the pretext inquiry is not whether [the plaintiff] agrees with the reasons [the

defendant] gives for the [adverse employment action], but whether [the defendant] really was

motivated by those reasons."  *Standard v. A.B.E.L. Serv. Inc.*, 161 F.3d 1318, 1333 (11th Cir.

44

1998).

As evidence of pretext, the plaintiff asserts the following:

(1) Less than a month before the plaintiff's termination, McReynolds was recommending to Dr. Gilbert that the plaintiff's position be expanded to Director of Design and a juror could find it incredulous, at best, that on November 10, 2004, McReynolds then made the decision to eliminate the plaintiff's position in order to save money by outsourcing.  (Doc. 42 at p. 33). However, the plaintiff cites no support for her contention that McReynolds recommended any upgrade to Gilbert and the only evidence the court can find in the record regarding the same is to the contrary.  (See Gilbert Dep. at pp. 57-59).  Furthermore, the record evidence shows that McReynolds had no decision making authority regarding personnel issues.  Instead, he could make recommendation to human resources or to Lynda Gilbert.

(2) Dr. Gilbert was in support of the upgrade up to two months prior to the plaintiff's termination.  Coress Brandon testified that Dr. Gilbert responded positively to the idea during one conversation as they were walking through residence halls sometime in the summer of 2004. (Brandon Dep. at pp. 64-66).  Brandon's statement is not sufficient to establish pretext. Additionally, the plaintiff's cite to Gilbert's testimony does not support this assertion.  The fact that Gilbert responded positively to Brandon does not establish Gilbert's approval of an upgrade. Instead, what Brandon perceived is just that - - her perception.  It is not sufficiently demonstrative of pretext to overcome the defendant's motion.

(3) The plaintiff's office was being prepared to be moved in order to accommodate this plan.  The fact that some people at the University were considering an expansion of the plaintiff's job duties is not sufficient to undermine Gilbert's (the only person with ultimate authority) basis

for the ultimate decision to outsource the interior design functions.  It is evident that at times, certain departments at the University were not sufficiently aware of what was occurring elsewhere.

(4) The fact that the University hired Beville and "another individual" to perform the anticipated "expanded duties" is further evidence that the defendant's basis for outsourcing is without merit.  The pretext argument is without merit because the defendant did, in fact, implement the outsourcing.

(5) There are discrepancies as to who made the decision to terminate the plaintiff.  The court has already determined that McReynolds was without authority to make the ultimate decision.  As stated previously, even the plaintiff asserts that McReynolds did not act alone.[49]

(6) The over ten month delay in outsourcing is evidence of pretext.  The defendant admits that the process of outsourcing took longer than it should have due to revisions to the RFP and the priority of other ongoing projects.  (Gilbert Dep. at pp. 68-69; Johnson Aff. at ¶ 6).  Although the University was not the model of efficiency with regard to the handling of the outsourcing, the delay is insufficient to demonstrate pretext.

The plaintiff simply has not produced evidence sufficient to support an inference that the University was motivated by discriminatory intent to terminate her.  Even if it had, the plaintiff has failed to offer evidence sufficient to establish that the defendant's proffered reasons are pretext for unlawful discrimination.  To the contrary, the plaintiff has not come forth with any evidence tending to establish any discriminatory animus towards the plaintiff on the basis of her

---

[49]The plaintiff complains that McReynolds did not even know what her job duties were, which she says is further evidence of pretext.   However, having already found that she has failed to show that McReynolds was the only decisionmaker, the court finds that argument insufficient to establish pretext.

gender.[50]  While some inconsistencies do exist among Gilbert's and McReynolds's testimony,

those inconsistencies do not show intentional discrimination against her on the basis of her

gender.

### B.   Retaliation

The plaintiff next contends that she was not hired for the ADHO position in retaliation for

filing an EEOC charge and lawsuit against the University.  As stated by the United States

Supreme Court:

> Under Title VII of the Civil Rights Act of 1964, 78 Stat. 255, as amended,
> 42 U.S.C. § 2000e-3(a), it is unlawful "for an employer to discriminate against
> any of his employees . . . because [the employee] has opposed any practice made
> an unlawful employment practice by [Title VII], or because [the employee] has
> made a charge, testified, assisted, or participated in any manner in an
> investigation, proceeding, or hearing under [Title VII]."

*Clark County School Dist. v. Breeden*, 532 U.S. 268, 269, 121 S. Ct. 1508, 1509, 109 L . Ed. 2d

509 (2001).  In the instant case, the defendant contends that the decisionmaker simply did not

find the plaintiff to be the best candidate for the position.

The appropriate framework from which to evaluate the plaintiff's retaliation claim is the

same familiar *McDonnell Douglas* standard used for the plaintiff's gender discrimination claim.

The plaintiff has the initial "burden of establishing a prima facie case."  *McDonnell Douglas,* 411

U.S. at 802.  If the plaintiff is able to establish a prima facie case, the defendant must articulate a

legitimate, nondiscriminatory reason for its decision.  Once the defendant has articulated its

legitimate, nondiscriminatory reasons for the plaintiff's termination, the court "must, in view of

all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's

---

[50]The plaintiff also argues her qualifications for the ADHO position in the pretext portion of her brief.  As the ADHO
position has nothing to do with her discrimination claim, the court will not address it here.

proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct." *Combs*, 106 F.3d at 1538 (citing *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).

To establish a prima facie case of retaliation, the plaintiff must prove three elements: (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that the adverse employment action was causally related to the protected activity. *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998).

In the instant case, the defendants only contest the third prong. The plaintiff undoubtedly engaged in protected activity by filing her EEOC charge and lawsuit. Therefore, the court must now determine whether the University's failure to hire her was causally related to her protected activity. The plaintiff asserts that Jones was aware of the plaintiff's pending litigation and her EEOC charge at the time he made the decision not to hire her. (Doc. 42 at pp. 38-41).

United States District Judge Robert B. Propst addressed the issue of what constitutes a causal relationship in the retaliation context in *Taylor v. Renfro Corp.*, 84 F. Supp. 2d 1248 (N.D. Ala. 2000). He stated:

> The Eleventh Circuit "interpret[s] 'the causal link requirement broadly; a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *Meeks v. Computer Assoc. International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *Reichhold*, 988 F.2d at 1564). The Eleventh Circuit also does "not construe the 'causal link' . . . to be the sort of logical connection that would justify a prescription that the protected [activity] in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant." *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985). And while not a per se requirement, courts do consider the amount of time lapsed between the time of the complaint and the time of the adverse

48

employment action.  *See Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1556 (11th Cir. 1995); *Maniccia v. Brown*, 171 F.3d 1364, 1369-70 (11th Cir. 1999).

A causal link has been found sufficient to withstand a defendant's motion for summary judgement, for example, where an employer discovered an employee's EEOC charge and a series of adverse employment actions commenced almost immediately, *Wideman*, 141 F.3d at 1457; where a supervisor was displeased with a HEW investigation and associated the employee who suffered adverse employment action with the investigation, *Simmons*, 757 F.2d at 1189; and where a plaintiff complained of sexual harassment in June, 1995, was terminated in April, 1997, and the plaintiff's performance evaluations for her 18 years of employment had been favorable, *Mortenson*, 54 F. Supp. 2d at 1124-25.

A causal link has not been found, for example, where the plaintiff failed a test and passing the test was necessary for being offered the job at issue, *Fleming v. Boeing Co.*, 120 F.3d 242, 248 (11th Cir. 1997); where the adverse employment action occurred 15 and 21 months, respectively, after the plaintiff filed a grievance against her employer, *Maniccia*, 171 F.3d at 1370 ("The only causal connection established by the evidence is between Appellant's misconduct and her termination."); where the plaintiff failed to complete necessary management tasks, had a poor working relationship, and refused to accept constructive criticism, *Coutu*, 47 F.3d at 1074-75; where the time lapse between plaintiff's complaint and her termination was 16 months, *Aldridge*, 847 F. Supp. at 486; and where plaintiff's complaint was thoroughly investigated, a detailed report was filed concerning the investigation, the subject of the complaint was sanctioned, strenuous efforts were made to put plaintiff into another position within the company, and plaintiff was ultimately terminated six months after her complaint was filed, *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1555 (11th Cir. 1997).

In this case, plaintiff was terminated approximately four months after her last formal complaint regarding Richardson's conduct.  The ensuing investigation consisted of Todd asking Richardson and Ingle what had happened (but did not include asking plaintiff what had happened), and cautioning Richardson and Ingle to not say things which might be misinterpreted by other employees.  She was terminated for recounting socks in violation of company policy.  She admitted to recounting socks, but claimed it was inadvertent.  Viewing the situation in the light most favorable to the plaintiff, she made three "formal" complaints, and she allegedly made numerous "informal" complaints up to January of 1997, one month prior to her termination.  Her work record prior to February 21, 1997, had been unblemished.  Richardson characterized her as a very good worker. [ ] Richardson was also aware that Taylor had complained to Bennett about his

49

conduct. [ ]  She was terminated on her first mistake, despite the fact that she
admitted the error and gave an explanation for it.  Based on this, it does not appear
that the employment action and plaintiff's complaints were wholly unrelated.
Thus, plaintiff has satisfied the third prong.

Taylor, 84 F. Supp. 2d at 1259-60 (footnotes omitted).

Although temporal proximity is certainly a valid consideration in the retaliation context,
the court finds the circumstances in this case different from those cases where we measure the
lapse in time between the protected activity and a termination.  In the failure to hire context, job
positions are not likely to come open "on any given day, as opposed to the firing of an employee
or the issuance of a disciplinary letter."  *See Autry v. Nassau County School Board*, 2006 WL
1232812, *15 (M.D. Fla. May 8, 2006).  Therefore, for the purposes of this motion, the court
finds that the plaintiff has established a *prima facie* case of retaliation simply by showing that the
decisionmaker was aware of her protected activity.

The defendants assert, nonetheless, that the plaintiff was not chosen for the ADHO
position because Beville was the better candidate.  For example, it asserts that Jones was not
impressed with the plaintiff's failure to respond to his questions, her interrupting him on several
occasions, her lack of enthusiasm for the job, and her focus on the old way of doing things in her
interview.[51]  Because the defendant articulated legitimate, non-discriminatory reasons for its

---

[51]Additionally, Jones articulated that:

> Linda Cashman was not the best qualified applicant for the [ADHO] position for several reasons.
> She frequently commented during our meetings that the way the University operated residence halls when she
> was an employee at the University was a good system.  Because I intended to change the old ways of doing
> things with respect to the residence halls, I did not expect to hire a person who was focused on the past.  In
> addition, Cashman commented on more than one occasion that the . . . [RAs], needed to do their jobs better
> to make the process for addressing facility needs work better.  This comment is also contrary to my
> philosophy that the University administrators should take responsibility for addressing problems and not try
> to pass blame to the student workers.  Cashman has a negative view of the student staff that was contrary to
> the attitude I desired in an employee.  Cashman did not demonstrate knowledge of the construction aspects of
> new residence halls and because the University was entering the initial stages of an aggressive increase in
> on-campus housing, I needed a person in this position who was familiar with construction issues.  I also

50

decision not to hire the plaintiff, the plaintiff must demonstrate that the proffered reasons for

hiring Beville over her were pretextual.  If the plaintiff fails to offer evidence showing that the

defendant's proffered reasons are pretextual, then summary judgment is mandatory.  *Chapman v.*

*Al. Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc).  Accordingly, the court must

"determine whether the plaintiff has cast sufficient doubt on the defendant's proffered

nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's

proffered 'legitimate reasons were not what actually motivated its conduct.'"  *Combs*, 106 F.3d at

1538.

     In support of her argument that the defendants' proffered reasons are pretext, the plaintiff

asserts that the reasons that Jones has given at the summary judgment stage for his preference of

Beville are not the same as those offered at his deposition or at the time of Beville's hire.  In fact,

the plaintiff alleges that the inconsistencies in Jones's testimony are "wholly different in nature."

(Doc. 42 at p. 43).  However, the court has already determined, in resolving the plaintiff's motion

to strike, that Jones's affidavit testimony is not "wholly different" than his deposition testimony.

     The plaintiff also asserts that her protected activity was known among the University and

was taken into consideration during the hiring process.  Specifically, the plaintiff asserts that she

was not initially given an interview and only was given one after involvement of University

counsel; one of the committee members admittedly paid her resume no attention; and the

---

needed a person willing to get personally involved in facility issues and willing to get his or her hands dirty, not just send in a work order request – Cashman's offered solution to facility repair and maintenance issues. Cashman was detached in her interview as compared to the other candidates, who were very much willing to be active participants in my plans to improve the residential communities on campus.  Finally, Cashman interrupted me several times in our conversation and avoided answering questions that made her uncomfortable, even though I tried to obtain a response from her by rephrasing the question.

(Jones Aff. at ¶ 8).

selection process was a sham because Jones testified he would have ignored their recommendation even had the selection committee recommended her.  (Doc. 42 at p. 44).

The defendant argues that Jones cannot be held accountable for the discriminatory animus of any of the other University employees unless the plaintiff can establish a causal link between the animus and Jones's decision.  *See Llampallas v. Mini-Circuits Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998).  Although Jones testified that he did consider the materials provided by the search committee, he clearly testified that he made his own independent decision regarding who to hire.  While the plaintiff has presented evidence, which if attributable to Jones, may be considered discriminatory (such as Lawrence's emails),[52] she has simply not offered any evidence tending to show any discriminatory animus on Jones's part.  To the contrary, Jones took measures to ensure that the selection process would be fair.  For instance, he appointed  a committee to select and interview candidates for the position.  The committee consisted of individuals both within the department and without and a student representative.

Interestingly, the plaintiff also argues that Beville may have been pre-selected in support of her pretext argument.  Accepting the plaintiff's argument as true, if Beville did occupy the position even before it was posted, and thus, even before the plaintiff applied for it, that would

---

[52]In several emails during the application process for the ADHO position, Lawrence provided commentary such as:

"Share [a letter from Cashman expressing interest in the ADHO position] with the appropriate individuals.  Note the comment: 'exactly my old description." (Sent to Sharon Hale) and

"Guarantee you, [Jones] someone on your staff told her the position was open."  In response to Jones's email to her stating "Molly, the first complete application for the position was submitted by Linda Cashman.  Thanks, David."

(Plaintiff's Ex. 31).  While the court is aware that Lawrence is Jones's supervisor, there is no indication in the record that Lawrence attempted to or did control any of Jones's hiring decisions.  To the contrary, the record suggests that Jones was given authority to assemble his own staff and organize his department as he deemed most effective.  In fact, within weeks of his hire, Jones had initiated six to eight searches in an effort to change the status quo at the University and to create a new level of excellence.  (Jones Aff. at ¶¶ 3 & 5).

only go to further show that her non-selection had nothing to do with her protected activity.

Lastly, the plaintiff's argument on disparity in qualifications would be relevant if the position was particularly defined as an interior design position. However, her superior interior design experience is of little importance to a position that does not involve significant interior design functions.[53] Even still, it is not the court's duty to measure the reasonableness of the employer's decision. "We do not ask whether the employer selected the 'most' qualified candidate, but only whether it selected the candidate based on an unlawful motive . . . It is the employer's role, not the role of the court, to 'identify those strengths that constitute the best qualified applicant." *Haley v. Potter*, No. Civ.A.2:03CV398-SRW, 2006 WL 861350, at *4 (M.D. Ala. March 31, 2006).

---

[53]The ADHO position responsibilities are:

1.  20% Act as a liaison with the students, administrative staff . . . on issues that have an impact on the living conditions and satisfaction of services provided by Housing . . . This may include, but is not limited to, providing recommendations and coordination with the university's design consultant, the establishment of standards and the continuous assessment of facility operations, cleanliness, and safety and the coordination of multiple departmental efforts to maintain those standards.

2.  20% Facility assessment and prioritization of required corrective action.

3.  15% Collaboratively develop short term improvement goals as well as represent Housing & Residential Communities in capital improvement projects and the campus master plan.

4.  15% Responsible for the purchases of furnishings, fixtures, equipment and materials necessary to maintain the residence halls to the standards established by the department and the design consultant.

Responsible for the management of an inventory system to insure the most advantageous replacement cycle and proper handling of furnishings, fixtures, equipment, and materials.

5.  15% Address safety concerns and risk mitigation options for Residence Hall staff and programs. Coordinate efforts with multiple departmental leaders on addressing facility emergency action plans, accessibility, and adherence to all state and federal public facility guidelines. Serve as risk management resource for the Division of Student Affairs.

6.  10% Research current trends in Housing & Residential Communities on leading college campuses. Report these trends to assess the probability and necessity for implementation.

7.  5% Assist the program staff of Housing & Residential Communities with special event, special circumstances or periodic increases in departmental work responsibilities (i.e. check-in, check-out, Sorority bid day, and Fall housing registration).

53

Therefore, the court finds that the plaintiff has failed to produce evidence to overcome the defendant's proffered reasons for her elimination. *See Chapman*, 229 F.3d at 1037 (holding that "in order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable fact finder to conclude that each of the employer's proffered . . . reasons is pretextual."). Accordingly, the court hereby finds that the defendant's motion for summary judgment is due to be granted on the plaintiff's retaliation claim.

### Due Process Violation

The plaintiff's final claim is that she had a protected property interest in her continued employment as an Interior Designer with the University, which the defendant and individual defendants Gilbert, McReynolds, Witt, and Harris, deprived her of without due process of law. (Doc. 16 at ¶¶ 53-61). The plaintiff can only establish a protected property interest in her employment if she can show "a legitimate claim of entitlement to continued employment under state law." *Green v. City of Hamilton*, 937 F.2d 1561, 1563 (11th Cir. 1991). Thus, the "crucial question is whether the employment is terminable by the employer 'at will' or whether the employer's discretion to discharge the employee is somehow fettered." *Green*, 937 F. 2d at 1564. According to the Eleventh Circuit:

> Under Alabama law, "permanent" employment means employment for as long as the employer is in business and needs the services the employee provides, and the employee is willing and able to do his work and gives no cause for discharge. Although Alabama courts consider employment "at will" to be the norm, they will recognize and enforce contracts for "permanent" employment - as construed above - under certain circumstances. An employment relationship is "permanent," and thus not terminable "at will," if: (1) there was a clear and unequivocal offer of "permanent" employment, (2) the employee provided some substantial consideration for the contract apart from the services to be rendered, and (3) the individual making the offer had authority to bind the employer.

54

*Green*, 937 F.2d at 1564 (citations omitted).

The defendants argue that because the plaintiff's employment was terminable at will, she did not have a protected property interest.  The court agrees.  The University employment handbook specifically provides:

> The State of Alabama is an employment at-will state.  This handbook should not be construed as, and does not constitute an offer of employment for any specific duration, nor is it intended to state any terms of employment.  Although it is desirable for employees to have a long term employment relationship with the University, either the employee or the University may terminate the relationship at any time, for any reason, with or without notice.

(Doc. 33, Ex. 4B at p. 3).  The language in the University's handbook is precisely the type language that expressly does not create permanent employment.  *See Hoffman-La Roche, Inc. v. Campbell*, 512 So. 2d 725, 734 (Ala. 1987).  Although the Eleventh Circuit has warned that the contract for "permanent" employment may be oral, the plaintiff has not made any allegations that she was promised permanent employment, so as to undermine the clear language of the handbook.

Additionally, the plaintiff has not made any allegation that she rendered substantial consideration apart from her design services to the University.  To the contrary, the plaintiff testified that she graduated from the University and immediately went to work for the University.  (Cashman Dep. at p. 13).  The plaintiff does not claim to have made any of the financial or personal sacrifices, such as relocation and having a spouse give up a job, that the court considered in *Green*.  Without evidence of a permanent employment contract, the plaintiff simply cannot establish a protected property interest, and thus, cannot establish a due process violation.  For the foregoing reasons, the undersigned hereby finds that the plaintiff's due process claim is to

be dismissed against all defendants.

## CONCLUSION

In accordance with the findings set out herein, the undersigned hereby finds that the defendants' motion for summary judgment (doc. 31) is due to be granted.  The court further finds that the plaintiff's motion to strike (doc. 41) is due to be denied and the defendant's motion to strike (doc. 49) is due to be granted in part and denied in part as stated herein.  An Order to that effect will be entered contemporaneously herewith.

**DONE,** this the 16th day of May, 2007.

*John E. Ott*

**JOHN E. OTT**
United States Magistrate Judge